# Illinois Official Reports

## Appellate Court

---

### *People v. Martinez*, 2021 IL App (1st) 182553

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAUL MARTINEZ, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-18-2553 |
| Filed | September 24, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CR-8493; the Hon. Alfredo Maldonado, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part, and remanded with directions. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Michael H. Orenstein, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Phyllis Warren, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.<br>Presiding Justice Pierce and Justice Mikva concurred in the judgment and opinion. |

**OPINION**

¶ 1   Defendant Raul Martinez was convicted of first degree murder and unlawful use of a weapon by a felon (UUWF) following a jury trial. He was sentenced to an aggregate, consecutive prison term of 105 years for murder, 25 years for a firearm enhancement, and a Class X sentence of 30 years for UUWF. On appeal, defendant contends that (1) the trial court erred in denying his motion *in limine* to present *Lynch* evidence of decedent's 2006 robbery conviction to support defendant's self-defense claim (see *People v. Lynch*, 104 Ill. 2d 194 (1984)) and (2) his Class X sentencing for UUWF was improper because it rests on an improper double enhancement and an offense that is no longer criminal. For the following reasons, we affirm in part and remand for resentencing on defendant's UUWF conviction.

¶ 2                                    I. BACKGROUND

¶ 3   As defendant's issues raised on appeal concern questions of law, we will only recite such facts as are necessary to decide this appeal. Defendant's convictions and sentences stem from the shooting death of Robert Roseneau (decedent) on May 2, 2016. Defendant did not dispute that he shot and killed decedent; rather, he contended at trial that it was self-defense rather than first degree murder as alleged by the State.

¶ 4                                 A. Pretrial Proceedings

¶ 5   Prior to trial, both the State and defendant filed motions *in limine*, and a hearing was held on April 6, 2018. The State moved to impeach defendant with three prior convictions: UUWF, possession of a stolen motor vehicle (PSMV), and a 2009 robbery. The trial court did not allow the introduction of the UUWF for impeachment, finding that it was too prejudicial. However, the trial court allowed the introduction of the PSMV and robbery convictions.

¶ 6   Defendant moved to admit *Lynch* evidence of decedent's prior convictions in support of the self-defense answer he filed on February 28, 2018. Specifically, he moved to admit decedent's prior convictions for aggravated battery of a peace officer in 2012 and a May 22, 2006, robbery conviction. That offense stemmed from an incident on February 14, 2006, where decedent grabbed a woman's purse and struggled with her before pushing her to the ground and absconding with her purse. The trial court allowed the introduction of decedent's conviction for aggravated battery of a peace officer but disallowed introduction of the robbery conviction. The trial court found that the robbery conviction was too remote and additionally that the force used in pushing the woman to the ground was "motivated for gain and not just simply a propensity of violence." The matter then proceeded to trial.

¶ 7                                 B. Trial Proceedings

¶ 8   Briefly stated, the evidence presented at trial established that defendant shot and killed decedent just before 10:30 p.m. on May 2, 2016, near Pulaski Road and Armitage Avenue in Chicago. The State presented the testimony of decedent's sister, who identified a photo of decedent as well as an image of him captured on video that night. The State also presented the testimony of several Chicago police officers who investigated the shooting and arrested defendant. Specifically, Officer Chris Meilinger testified that he and Officer Przemyslaw Worwa were on routine patrol near the area in a marked SUV that was equipped with a

dashboard camera and an inside camera system. As they drove west on Armitage Avenue towards Pulaski Road, Officer Meilinger heard multiple gunshots coming from north of their location. He saw a group of people at a Shell gas station (Shell) "ducking and diving for cover." When they turned north on Pulaski Road, Officer Meilinger saw defendant approximately five feet from where decedent's body was discovered before he ran west across Pulaski Road and into the alley north of Armitage Avenue. As defendant ran with the officers in pursuit, he dropped a 45-caliber semiautomatic handgun to the ground. Defendant ran south into a fenced-in area behind Trier Lads Bar (Trier) located at 4010 West Armitage Avenue, where he was subsequently arrested.

¶ 9        The State published several video clips during its case-in-chief from (1) Shell's "Camera 5," (2) Shell's "Camera 7," (3) the Redflex red light camera on Armitage Avenue, (4) the dash camera video from Meilinger's vehicle, (5) Trier's camera, and (6) the police vehicle's rear passenger camera. Among other things, the Shell videos captured decedent interacting with people at Shell, defendant walking north across the front of Shell's store, Officer Meilinger's vehicle turning north on Pulaski Road from Armitage Avenue, decedent walking west through Shell and turning towards 2015 North Pulaski Road, defendant walking towards the same area that decedent went to, and defendant running back west across Pulaski Road and into the alley north of Armitage Avenue with the police in pursuit. The red-light camera captured defendant walking west on Armitage Avenue and turning into Shell and walking past the store, as well as Officer Meilinger's vehicle turning north on Pulaski Road from Armitage Avenue. The dash camera captured defendant's flight down the alley and his arrest. Trier's camera also captured defendant's arrest, and the rear passenger camera captured defendant inside the police vehicle after his arrest.

¶ 10       The evidence technician, Detective Abdalla Abuzanat, testified that he processed the crime scene and recovered seven fired cartridge cases and two fired bullet fragments from the sidewalk in front of 2015 North Pulaski Road and Shell's adjacent alley. He saw two bags of suspect cannabis and possible blood stains in the area of the fired fragments. Detective Abuzanat also recovered defendant's gun from the alley behind 4010 West Armitage Avenue and subsequently recovered defendant's black hoodie.

¶ 11       Detective Richard Green administered a gunshot residue test to both of defendant's hands, which established the presence of gunpowder. Dr. Timothy Fagan, the medical examiner, testified that he supervised decedent's autopsy. He opined that decedent died from multiple gunshot wounds: (1) two different bullets entered a "combined" entrance wound on the left side of the victim's chest; one traveled through the diaphragm and the heart before lodging in the lower right lung, and the other traveled through the diaphragm and into the abdominal cavity, where it was recovered from the loop of the small bowel; (2) a "through and through" gunshot wound to the back of the right forearm where the bullet exited the front right forearm; (3) a "through and through" gunshot wound to the back of the left forearm where the bullet exited the front left forearm; (4) a gunshot wound to the left buttock, which exited the inside of the left thigh; (5) a gunshot wound to the back of the right thigh with the bullet recovered from inside the thigh; (6) a graze wound to the inside right thigh; (7) a gunshot wound to the back of the right thigh, which exited the front; and (8) a "through and though" gunshot wound to the penis. Additionally, Dr. Fagan testified that a bullet from a prior shooting was recovered from decedent's back and there was cocaine in his system. On cross-examination, he stated

that decedent was 5 feet, 11 inches tall and weighed 269 pounds, agreed that a possible side effect of cocaine was aggression, and agreed that there was no evidence of close-range firing.

¶ 12     The State also presented testimony from Justyna Cioch, a firearms expert, who examined the gun, shell casings, bullets and bullet fragments that were recovered. Five of the six bullets recovered from decedent's body were fired from the recovered gun, as were the shell casings and bullet jacket fragment. Additionally, the magazine recovered with the gun had a total capacity of seven rounds.

¶ 13     Officer Russell Zagorski testified that he responded to a call of a gunshot victim on May 2, 2016, at approximately 10:30 p.m. near 2015 North Pulaski Road. When he arrived, he saw a small crowd around decedent's body. He did not see any weapons in the area around the victim, nor did he observe anyone in the crowd with a weapon. On cross-examination, Officer Zagorski agreed that he did not know if anyone in the crowd removed anything from decedent prior to his arrival and further stated that the crowd was "uncooperative" and "talking over each other."

¶ 14     The parties stipulated that defendant had three previous felony convictions and provided the case numbers in open court.

¶ 15     After the trial court denied defendant's motion for a directed verdict, Chicago police officer Jason Cloherty testified on defendant's behalf. He testified that on April 30, 2011, when other officers brought the "highly agitated" decedent to the police station, he went to the processing room as backup for the search of decedent. Decedent refused to be searched and pushed Officer Steven Gregory in the chest and punched him in one of his ears. In response, Officer Gregory struck decedent, who fell to the floor. While on the floor, decedent kicked Officer Cloherty in the shins before being tased by another officer.

¶ 16     Officer Gregory testified consistent with Officer Cloherty about the 2011 incident at the police station. He initially stopped decedent at a gas station on Pulaski Road and Armitage Avenue for having tinted windows. Officer Gregory, who had previous encounters with decedent, arrested him and took him to the police station after learning that decedent was driving on a suspended license. Because decedent was "very agitated," he asked Officer Cloherty to assist in conducting a custodial search.

¶ 17     Defendant testified that at approximately 10 p.m. on May 2, 2016, he was walking near Diversey Avenue and Harding Avenue, leaving from his aunt's house, and heading to Cortland Street and Pulaski Road where his girlfriend lived. She lived approximately 10 blocks away, but he did not remember all the street names in the area. He admitted that he had a gun and stated that he carried it for his "safety and protection." Defendant turned south on Hamlin Avenue from Diversey Avenue and began walking towards Cortland Street. As he approached Armitage Avenue, he saw a group of people across the street. According to defendant, they were looking at him and said something that he could not hear, and then two people started walking towards him. To avoid them, defendant turned right on Armitage Avenue, toward Pulaski Road. When he reached Pulaski Road, defendant cut through the Shell to the adjacent alley and put his hood on as he walked west down the alley toward the Pulaski Road sidewalk.

¶ 18     He intended to walk down Pulaski Road to Dickens Avenue, Dickens Avenue to Hamlin Avenue and then Hamlin Avenue back to Diversey Avenue. Defendant did not see anyone at the mouth of the alley as he walked down it, and he turned to look at the gas station to see if anyone from the group had followed him.

¶ 19     As he looked forward, defendant saw a man (decedent) from eight feet away come out of nowhere. Decedent was "real big and heavy"; defendant was 5 feet, 5 inches tall, and weighed 150 pounds. He stated that decedent walked towards him and said, "motherf***, what are you doing over here. I'm going to smoke your b*** a***." Defendant understood that to mean that decedent was going to kill him. He stated that decedent's hands were by his waist, and he "thought" he saw a gun in decedent's hands. Decedent approached him, and he was afraid. Defendant took his gun from his waistband and began shooting at decedent. When he fired his gun the first time, decedent was six feet away. Defendant started running after he fired the first shot and kept shooting as he ran because he was scared and thought decedent was going to kill him. Defendant stated that he did not see where he was shooting and did not know how many times he fired his gun. Defendant ran west across Pulaski Road and into an alley. As he ran, he heard a car following him and saw that it was a police car when he looked back. He dropped the gun and tried to get as far as he could from it. Defendant was arrested shortly thereafter.

¶ 20     On cross-examination, defendant testified that he lived at 1458 South Canal and took the train to visit his aunt earlier that day near Diversey Avenue and Harding Avenue. When he got off the train, he went to Monticello Avenue and Argyle Street, a few blocks from his aunt's house, to retrieve his gun from a gangway next to an empty house. Defendant stated that he bought the gun two months earlier for $250 from a drug user for his protection. He never checked to see if the gun was loaded and denied buying ammunition for it. Defendant left the gun in the gangway because he "did not want to have it on [him] all the time." He acknowledged that he was shown in the Shell videos but denied that he was covering his face in the video. He also acknowledged that the video showed decedent "calmly" walking around the gas station parking lot and talking with a woman who was getting into a car. Defendant also acknowledged that the video showed him walking west through the gas station's alley, heading in the same direction that decedent walked in earlier. He further admitted that less than 10 seconds later, the video showed him running west across Pulaski Road and into the alley. Defendant also stated that he did not see a gun in decedent's hands and that decedent was not facing him when he shot him the first time. He denied that decedent turned away as defendant was shooting at him and further stated that he was 10 feet from the victim when he stopped shooting. When defendant turned south in the alley into the fenced-in area behind Trier, there was nowhere else to go. According to defendant, when he spoke with detectives the following morning, he did not remember running from the police and did not remember anything due to having blackouts.

¶ 21     Also on cross-examination, defendant admitted that he could have continued walking down Pulaski Road instead of cutting through the gas station and that he knew how to avoid the people he encountered on the corner of Armitage Avenue and Hamlin Avenue. He also admitted that the police dash camera video did not show a group of people on Armitage Avenue. Defendant also stated that he encountered decedent in front of a building located at 2015 North Pulaski Road but agreed that he could see through the fence around the yard at that location and further that as he walked west through the alley, he could see the sidewalk area before he reached it.

¶ 22     On redirect examination, defendant stated that he put his hood up after he saw the group on Armitage Avenue to cause less attention. He also testified that the shooting happened in a matter of seconds and he did not know exactly where he fired the gun. Defendant further stated that he told the police that he did not remember what happened and that he had blackouts

because he was scared and did not know what happened to decedent. Defendant reiterated that, when decedent threatened him, his hands were at his side.

¶ 23 After defendant's testimony, the parties stipulated that decedent was convicted of aggravated battery to a police officer.

¶ 24 In rebuttal, the State called Officer Kurt Catalan, who testified that at approximately 10:30 p.m. on May 2, 2016, he was near North and Grand Avenues, and he responded to a call of shots fired near Armitage Avenue and Pulaski Road. He arrived at the scene less than a minute later, and as he turned north on Pulaski Road, two other police vehicles drove in front of him, and his vehicle was the fourth to arrive there. He did not observe anyone run from the scene, and his dash camera video was published to the jury. Officer Catalan further testified that the quickest route to Cortland Street and Pulaski Road from Diversey Avenue and Harding Avenue would be to take Pulaski Road south; it would not make sense to walk north on Pulaski Road from Armitage Avenue, as that would be in the opposite direction of Cortland Street.

¶ 25 Defendant's certified convictions for robbery and PSMV were admitted into evidence. During the jury instructions conference, the trial court denied defendant's request for an instruction on involuntary manslaughter but agreed to instruct the jury on second degree murder and self-defense. After closing arguments and deliberation, the jury returned verdicts for two counts of first degree murder and three counts of UUWF.

¶ 26 C. Posttrial Proceedings

¶ 27 Defendant's motion for a new trial was denied; in it, he alleged that the trial court erred in denying his request to introduce evidence of decedent's 2006 robbery conviction as *Lynch* evidence.

¶ 28 At sentencing on November 6, 2018, the State indicated that defendant's UUWF sentence had to be Class X based on his background, without objection by defense counsel. The trial court noted that this was not a self-defense case but a "cold, calculated murder, absolutely murder." Defendant was subsequently sentenced to 50 years' imprisonment for murder plus a 25-year firearm enhancement. The second murder count merged. Based on defendant's prior criminal history, defendant was sentenced as a Class X offender to 30 years' imprisonment on one count of UUWF (count VII), predicated on a prior UUWF conviction under case number 13 CR 21751. The remaining UUWF counts merged into count VII, and all sentences were consecutive, for an aggregate sentence of 105 years' imprisonment. Defendant's motion to reconsider his sentence was denied,[1] and this timely appeal followed.

¶ 29 II. ANALYSIS

¶ 30 On appeal, defendant contends that (1) the trial court erred by denying his motion *in limine* to introduce evidence of decedent's robbery conviction to support defendant's self-defense claim and (2) his Class X sentencing for UUWF was improper because it rests on an improper double enhancement and an offense that is no longer criminal.

---

[1]The motion to reconsider sentence did not raise any issue concerning defendant's Class X sentence for UUWF.

¶ 32 Defendant first contends that the trial court erred in denying his motion *in limine* to use decedent's 2006 robbery conviction as *Lynch* evidence to support his self-defense theory. He argues that the trial court incorrectly found the evidence too remote because the 10-year limit should have properly excluded time in prison, which the court failed to consider. He cites *People v. Montgomery*, 47 Ill. 2d 510 (1971), as support for this argument. Additionally, defendant argues that, contrary to the trial court's finding, decedent did have something to gain—when he threatened defendant after saying "What are you doing over here"; this suggested an effort to enforce turf or a drug sale location. He asserts that the proffered evidence showed decedent's violent character and propensity for violence. Defendant contends that, because the State presented no direct evidence and the jury needed the *Lynch* evidence to properly evaluate the State's circumstantial case, the error was not harmless and he should be granted a new trial.

¶ 33 Contrary to defendant's assertions, the State contends that the trial court properly exercised its discretion by excluding the proffered *Lynch* evidence of a robbery that decedent committed more than 10 years prior to his death. The State maintains that the remoteness of the conviction as well as the type of force and motive behind it, namely a push to the ground to gain control of a purse, supported the court's decision, especially where other evidence of decedent's violent and aggressive character was admitted at trial. The State notes that defendant did not introduce evidence of decedent's release date for the robbery conviction but instead opines on appeal that "with day-for-day credit, [decedent] would have served 18 months; even with 180 more good-conduct days, he would still have served a full year." However, the State argues that, absent such evidence, a trial court must not resort to any presumptions regarding a release date and must use the date of the conviction, which was May 22, 2006. See *People v. Naylor*, 229 Ill. 2d 584, 597 (2008). Regarding defendant's reliance on *Montgomery*, the State asserts that its 10-year time limit is not applicable when considering the admissibility of *Lynch* evidence because it was intended solely for impeachment of a testifying witness. See *Montgomery*, 47 Ill. 2d at 516.[2] The State further maintains that any error in excluding such evidence was harmless beyond a reasonable doubt given the overwhelming evidence establishing that defendant was not justified in shooting decedent and the excluded *Lynch* evidence would not have affected the verdict.

¶ 34 The decision to grant or deny a motion *in limine* rests within the sound discretion of the trial court, and that decision will not be disturbed absent an abuse of discretion. *People v. Hillis*, 2016 IL App (4th) 150703, ¶ 112. We will find an abuse of discretion only where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

---

[2]This rule has since been codified in Illinois Rule of Evidence 609 (eff. Jan. 1, 2011), which provides that:

"(a) *** [f]or the purposes of attacking the credibility of a witness, evidence that the witness has been convicted of a crime, *** is admissible only if the crime, (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted ***.

(b) *** [e]vidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date."

¶ 35    In *Lynch*, our supreme court held that, when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor. *Lynch*, 104 Ill. 2d at 200.

"*Lynch* was codified in Illinois Rule of Evidence 405(b)(2) (eff. Jan. 1, 2011), which states: 'In criminal homicide or battery cases when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of specific instances of the alleged victim's prior violent conduct.' " *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 73.

¶ 36    Pursuant to *Lynch*, the evidence of the victim's violent character may be offered in one or both of the following circumstances:

"First, the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior. The same deadly force that would be unreasonable in an altercation with a presumably peaceful citizen may be reasonable in response to similar behavior by a man of known violent and aggressive tendencies. One can consider facts one knows, however, and evidence of the victim's character is irrelevant to this theory of self-defense unless the defendant knew of the victim's violent nature ***.

Second, evidence of the victim's propensity for violence tends to support the defendant's version of the facts where there are conflicting accounts of what happened. In this situation, whether the defendant knew of this evidence at the time of the event is irrelevant." *Lynch*, 104 Ill. 2d at 200.

¶ 37    Having outlined the main legal principles involved, we now turn to defendant's arguments concerning evidence of decedent's 2006 conviction, which he sought to introduce in support of his assertion of self-defense, which the trial court barred. We review the trial court's judgment, not the reasons cited, and we may affirm on any basis supported by the record if the judgment is correct. *People v. Anderson*, 401 Ill. App. 3d 134, 138 (2010). We begin by noting that, in any *Lynch* situation, we must first decide whether the defendant was entitled to introduce *Lynch* at all, namely whether he properly raised a theory of self-defense in his case, which merited consideration of the *Lynch* principles. *People v. Figueroa*, 381 Ill. App. 3d 828, 842 (2008).

¶ 38    In the case at bar, defendant filed an answer raising a self-defense theory in which he alleged that decedent was the aggressor in the alley, which prompted defendant to shoot him. At trial, defendant testified consistent with that theory, stating that decedent threatened him, and that, although he did not see a gun, he thought that decedent was reaching for a gun when he shot him. Initially, defendant testified that decedent came out of nowhere, but he later admitted on cross-examination that he could clearly see the sidewalk area prior to approaching it.

¶ 39    Aside from defendant's admission to the shooting, the State's evidence consisted primarily of videos that showed decedent entering the alley first, defendant following him shortly thereafter, and defendant running from the alley after the shooting. Further, Officer Catalan testified in essence that defendant was walking the opposite way of his girlfriend's house, which, according to his testimony, is where he was headed. Moreover, there were no eyewitnesses and most of decedent's wounds were to the back of his body.

¶ 40     Based on the aforementioned, the question of whether defendant properly raised a theory of self-defense is not in dispute. What is in dispute, however, is whether his theory merited consideration of the *Lynch* principles. Defendant basically alleges that decedent was the aggressor and threatened him with violence. Accordingly, we find that, although scant, defendant's testimony could serve as support for the admission of *Lynch* evidence to show decedent's aggressive and violent character.

¶ 41     Pursuant to *Lynch*, defendant sought the admission of decedent's 2006 robbery conviction, which was approximately 10 years prior to decedent's murder, and decedent's 2012 conviction for aggravated battery to a peace officer. The trial court allowed the 2012 conviction but disallowed the 2006 conviction.

¶ 42     Thus, we must determine whether the trial court properly excluded evidence of decedent's 2006 conviction. It is clear from the record that decedent's 2006 conviction was not admissible under the first *Lynch* circumstance because defendant has not alleged, nor have we found in our review of the evidence presented at trial, that he was acquainted with decedent or had personal knowledge of the victim's tendencies, violent or otherwise. The record reveals that defendant lived at 1458 South Canal Street, while the shooting occurred at 2015 North Pulaski Road, which is more than 40 blocks away; so they did not live in the same neighborhood. While defendant testified that his aunt and girlfriend lived nearby, there was no evidence presented that there was any prior contact or conflict between defendant and decedent.

¶ 43     We now turn our attention to the second *Lynch* circumstance, evidence of decedent's prior violent acts: again, his 2006 robbery conviction. In *Lynch*, our supreme court noted that convictions for crimes of violence are reliable evidence of a violent character. *Lynch*, 104 Ill. 2d at 201. In order for a victim's prior conviction to be admissible as *Lynch* evidence, there must be conflicting accounts of what happened, the conviction must be for a "crime of violence," and the conviction must not be remote from the incident at issue. *Id.* at 200-03; *People v. Ellis*, 187 Ill. App. 3d 295, 301-02 (1989).

¶ 44     We have already determined that defendant's trial testimony could serve as a conflicting account of what happened when examined against the State's evidence. Notwithstanding the conflicting versions and contrary to defendant's assertion, the fact that this evidence may be relevant to show decedent's propensity for violence is not the only factor that a trial court should consider when determining whether to admit or exclude *Lynch* evidence. *People v. Simon*, 2011 IL App (1st) 091197, ¶ 72. Rather, in *Lynch*, our supreme court stated that defendant could demonstrate that the victim was the aggressor by "appropriate evidence" and discussed whether the convictions at issue amounted to "competent evidence" of violent character. *Lynch*, 104 Ill. 2d at 201, 204. Thus, whether evidence of decedent's 2006 conviction was competent *Lynch* evidence turns to the nature of the conviction.

¶ 45     At the hearing on defendant's pretrial motion *in limine*, review of decedent's 2006 robbery conviction revealed that decedent pushed a woman down to steal her purse after a struggle. The trial court excluded evidence of the conviction under *Lynch* because it determined that decedent's 2006 robbery conviction was too remote in time. Defendant argues on appeal that decedent's prison time should have been excluded when calculating whether the conviction was remote.

¶ 46     Remoteness in time is a valid consideration in determining whether it is reasonable for the trial court to allow the admission of evidence regarding the victim's violent character in a prosecution in which the defendant raises a claim of self-defense. *People v. Barnes*, 2017 IL

App (1st) 143902, ¶ 49. As correctly noted by the State, *Montgomery* is inapplicable to this case because decedent was not a testifying witness against whom defendant sought to admit evidence of a conviction for impeachment purposes. See *Montgomery*, 47 Ill. 2d at 516. However, even if *Montgomery* applies, we have previously determined that the trial court has discretion to exclude evidence of a conviction that is 10 or more years old. See *Ellis*, 187 Ill. App. 3d at 301-02.

¶ 47    In this case, decedent's robbery conviction was on May 22, 2006. Decedent's shooting death occurred on May 2, 2016, just slightly under 10 years since the robbery conviction. The record does not indicate that defendant proffered any evidence of decedent's release date for purposes of calculating the remoteness of decedent's robbery conviction. The trial court in its discretion determined that decedent's conviction was remote, presumably since his shooting death occurred just three weeks shy of the 10-year end point set by the *Montgomery* rule. See *Naylor*, 229 Ill. 2d at 598. In fact, we do not believe that the Montgomery 10-year end point was meant to be a bright line test or dispose of the trial court's discretion where the conviction is slightly more or less than 10 years. Accordingly, given the circumstances presented by this case, we find that the trial court did not abuse its discretion in disallowing the *Lynch* evidence of decedent's robbery conviction.

¶ 48    We further note that, even where evidence of the victim's propensity for violence should have been admitted, reversible error does not always occur if a trial court improperly excludes it. *People v. Armstrong*, 273 Ill. App. 3d 531, 536 (1995). We have previously found that such error is not reversible when it amounts to harmless error (*Figueroa*, 381 Ill. App. 3d at 846) and such error is harmless when the *Lynch* evidence is cumulative to other evidence presented at trial (see *People v. Nunn*, 357 Ill. App. 3d 625, 632 (2005)).

¶ 49    In this case, the jury heard evidence of decedent's violent and aggressive character, specifically that he was convicted in 2012 of aggravated battery of a peace officer, including testimony from the police officers involved in that altercation. Thus, we find that any error in the exclusion of decedent's 2006 robbery conviction was harmless where the record shows that other evidence was presented from which the jury could have concluded that decedent's prior conduct was violent. See *People v. Eshaya*, 144 Ill. App. 3d 757, 764 (1986).

¶ 50                      B. Class X Sentence for UUWF Conviction

¶ 51    Next, defendant contends that his Class X sentence was improper because it rests on an improper double enhancement and an offense that is no longer criminal. In support of his contentions, defendant argues that his prior UUWF conviction could not be used to make him Class X eligible because it was already used to prove the current charge of UUWF and constitutes an impermissible double enhancement. Defendant further argues that his robbery conviction occurred when he was a 17-year-old juvenile and is not "presumptively classified as a juvenile matter." Additionally, robbery is not currently classified as a Class 2 felony, so it cannot support his Class X sentencing. Defendant concludes that his PSMV conviction alone is insufficient to support Class X sentencing.

¶ 52    The State concedes that defendant's earlier conviction for UUWF could not be used to establish his eligibility for Class X sentencing because it was relied upon as an element of the offense and such use would be an impermissible double enhancement. However the State further responds that defendant's robbery conviction, committed when he was 17 years old, should not be excluded from consideration for Class X sentencing because the fact that the

legislature subsequently increased the age limit for juvenile court to 18 years old is irrelevant as it had no effect on defendant's prior conviction. The State notes that defendant was a juvenile who was convicted as an adult in criminal court. The State also argues that defendant misconstrues section 5-4.5-95(b) of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-95(b) (West 2018)) in that it applies to his previous conviction of a qualifying offense, not whether he would now be convicted of the qualifying offense, and his argument should be rejected under the plain language of the statute. Further, the State argues that defendant has forfeited review of this issue by failing to preserve the issue for appellate review.

¶ 53    Defendant acknowledges that this court has no jurisdiction to review merged or unsentenced convictions but asserts that we can review them to decide if any other valid convictions would have supported his Class X sentencing or eligibility, citing *People v. Dixon*, 91 Ill. 2d 346 (1982), in support. Additionally, defendant acknowledges that this issue was not raised in his postsentencing motion but asserts that it is reviewable under the second prong of plain error, as it affects his substantial rights. In the alternative, he contends that this court can review merged or unsentenced convictions for ineffectiveness of trial counsel where counsel failed to object or preserve the issue for review.

¶ 54    The failure to object to alleged error at trial and raise the issue in a posttrial motion ordinarily results in forfeiture of the issue on appeal. *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010). However, Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."

¶ 55    To establish plain error, a defendant must first show that a clear or obvious error occurred (*Thompson*, 238 Ill. 2d at 613) and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error (*Naylor*, 229 Ill. 2d at 593) or that the error was sufficiently grave that it deprived defendant of a fair sentencing hearing (*People v. Hanson*, 2014 IL App (4th) 130330, ¶ 26).

¶ 56    Here, defendant's claim that his sentence is not statutorily authorized affects his substantial rights and is reviewable as second prong plain error. *People v. Foreman*, 2019 IL App (3d) 160334, ¶¶ 41, 42. However, before considering application of the plain error doctrine, we must determine whether the trial court committed error, and the burden is on defendant to establish that an error occurred. *Thompson*, 238 Ill. 2d at 613. If we find that the trial court erred in sentencing defendant, we will consider whether the error rose to the level of plain error. *Simon*, 2011 IL App (1st) 091197, ¶ 75.

¶ 57    Whether defendant's prior convictions constitute qualifying offenses for purposes of mandatory Class X sentencing is a question of statutory construction that we review *de novo*. *People v. Baskerville*, 2012 IL 111056, ¶ 18.

¶ 58    Here, defendant was sentenced on November 6, 2018, to a Class X sentence of 30 years for UUWF based on his prior felony background pursuant to section 5-4.5-95(b) of the Code (730 ILCS 5/5-4.5-95(b) (West 2018)). He does not argue that a 30-year sentence for a Class X-eligible defendant is improper; rather defendant asserts that he was not eligible for a Class X sentence. Thus, our inquiry is whether the trial court erred in sentencing him to a Class X sentence for UUWF.

¶ 59    This issue has recently been addressed by this court in three cases, *People v. Miles*, 2020 IL App (1st) 180736, *People v. Williams*, 2020 IL App (1st) 190414, and *People v. Reed*, 2020

- 11 -

IL App (4th) 180533. In all three cases, the defendant was sentenced to a Class X term based on prior offenses committed when the defendant was a juvenile, prior to the amendment of section 5-120 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-120 (West 2014)). Moreover, certain juvenile offenses, including UUWF, were not excluded from juvenile jurisdiction under section 5-130 of the Act (see 705 ILCS 405/5-130 (West 2014)). In *Miles* and *Williams*, we found that the defendant's prior conviction was not a qualifying offense for Class X sentencing (*Miles*, 2020 IL App (1st) 180736, ¶ 11; *Williams*, 2020 IL App (1st) 190414, ¶ 21); however, in *Reed*, we found that the defendant's prior conviction committed when he was 17 years old could serve as a predicate conviction for Class X sentencing (*Reed*, 2020 IL App (4th) 180533, ¶ 29).We also acknowledge this issue is currently pending before our supreme court, which granted a petition for leave to appeal in *People v. Stewart*, 2020 IL App (1st) 180014-U, *appeal granted*, No. 126116 (Ill. Jan. 27, 2021).

¶ 60        It is undisputed that the Act was amended by the legislature in 2013 pursuant to Public Act 98-61 (eff. Jan. 1, 2014) (amending 705 ILCS 405/5-120) to raise the maximum age for juvenile jurisdiction from 16 to 17 for offenses that were not subject to automatic transfer. This amendment vested the juvenile court with exclusive jurisdiction over a defendant who, like defendant here, was 17 years old when he committed robbery. *Williams*, 2020 IL App (1st) 190414, ¶ 20. We have found that this amendment provided some indication that the legislature intended to treat minors who commit certain crimes differently from adults charged with those crimes. See *Miles*, 2020 IL App (1st) 180736, ¶ 21; *Williams*, 2020 IL App (1st) 190414, ¶ 20. Additionally, under the 2015 and 2016 amendments, defendants 15 years old and older accused of committing a forcible felony in furtherance of an illegal gang activity, and having a prior adjudication or conviction, would presumptively be transferred out of juvenile court. See Pub. Act 99-258 (eff. Jan. 1, 2016) (amending 705 ILCS 405/5-805(2)(a)).

¶ 61        Turning our attention to the sentencing statute at issue, section 5-4.5-95(b) of the Code provides:

> "When a defendant over the age of 21 years, is convicted of Class 1 or Class 2 felony, *** after having twice been convicted in any state or federal court of an offense that contains the same elements as an offense now (the date the Class 1 or Class 2 felony was committed) classified in Illinois as a Class 2 or greater Class felony *** and those charges are separately brought and tried and arise out of different series of acts, that defendant shall be sentenced as a Class X offender." 730 ILCS 5/5-4.5-95(b) (West 2018).

¶ 62        The language of section 5-4.5-95(b) has previously been found to be "clear and unambiguous." See *Foreman*, 2019 IL App (3d) 160334, ¶ 46. Because the statute is unambiguous, we need not consider the legislative history. *Id.* ¶ 43. The proper focus of the provision is on the elements of the prior offense. *Williams*, 2020 IL App (1st) 190414, ¶ 16. Additionally, we have held that a previous conviction cannot be used as a predicate offense under section 5-4.5-95(b) if it would have been resolved with delinquency proceedings in juvenile court rather than criminal proceedings. See *Miles*, 2020 IL App (1st) 180736, ¶ 11; *Williams*, 2020 IL App (1st) 190414, ¶ 21.

¶ 63        In the case at bar, defendant was convicted of robbery in criminal court when he was 17 years old, but a 2014 amendment to the Act has since given the juvenile court exclusive jurisdiction over 17-year-old defendants charged with robbery. As *Miles* and *Williams* instruct, we look at whether the elements of his prior conviction would have been resolved in

delinquency proceedings rather than criminal court proceedings and whether his predicate offense would have been a juvenile adjudication instead of a Class 2 or greater Class felony conviction. Section 5-4.5-95(b) is silent as to whether a juvenile adjudication is a conviction under its provisions. We note that our supreme court has previously held that juvenile adjudications do not constitute convictions. See *People v. Taylor*, 221 Ill. 2d 157, 176 (2006). Accordingly, we find that defendant's prior robbery conviction is not an offense now classified in Illinois as a Class 2 or greater Class felony, and therefore cannot serve as a predicate offense for Class X sentencing.

¶ 64    We recognize that the Fourth District of this court has reached a different result on this issue in *Reed*. However, this court is not bound to follow the decision of another district when our own district has decided contrary to that other district or there is a split of authority among the districts. *People v. Ward*, 192 Ill. App. 3d 544, 554 (1989). Each case must be decided on its own facts (*id.*), and given that this court has previously determined this issue, we are not obligated to follow *Reed*.

¶ 65    We now turn to defendant's contention that his Class X sentence was based on an impermissible double enhancement. A double enhancement occurs when either a single factor is used both as an element of an offense and as a basement for imposing a harsher sentence than might otherwise have been imposed or the same factor is used twice to elevate the severity of the offense itself. *People v. Owens*, 377 Ill. App. 3d 302, 304 (2007).

¶ 66    As noted above, defendant argues, and the State agrees, that his prior UUWF conviction could not be used to make him Class X eligible because it was already used to prove the current charge of UUWF, thereby constituting an impermissible double enhancement. We also agree that the UUWF cannot be used for Class X eligibility.

¶ 67    While the imposition of a sentence within a statutory sentencing range is reviewed for an abuse of discretion (*People v. Jones*, 168 Ill. 2d 367, 373-74 (1995)), the determination of whether a defendant is eligible for Class X sentencing is a question of law mandating *de novo* review (*People v. Baumann*, 314 Ill. App. 3d 947, 948 (2000)).

¶ 68    Here, defendant's background included three prior convictions: UUWF, PSMV, and a 2009 robbery. As just discussed, defendant's robbery conviction that occurred while he was a juvenile cannot serve as a predicate offense for Class X sentencing, and his prior UUWF conviction was used as an element of the offense. That only leaves defendant's PSMV conviction, which is only one prior conviction and not the two needed for Class X sentencing (730 ILCS 5/5-4.5-95(b) (West 2018)).

¶ 69    Consequently, we find that defendant's Class X sentencing was not statutorily authorized and was in error. Having found that error occurred, we therefore vacate defendant's Class X sentence for UUWF and remand for resentencing on that conviction.

¶ 70                                    III. CONCLUSION

¶ 71    For the foregoing reasons, we affirm defendant's convictions, the trial court's denial of his motion *in limine* to introduce evidence of decedent's 2006 robbery conviction as *Lynch* evidence, and his sentences for first degree murder and the firearm enhancement. We vacate defendant's Class X sentence for UUWF and remand for resentencing on that conviction.

¶ 72    Affirmed in part, vacated in part, and remanded with directions.