NOTICE
Decision filed 06/06/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230109-U

NO. 5-23-0109

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 21-CF-862 |
| | ) | |
| PAUL D. OUTLAND, | ) | Honorable |
| | ) | Thomas E. Griffith Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice McHaney and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's conviction for second degree murder is affirmed where any error on the part of the trial court for excluding evidence of the victim's convictions for domestic battery was harmless. The defendant's sentence for second degree murder is affirmed where the trial court did not abuse its discretion when it sentenced him to 18 years' incarceration.

¶ 2    Following a jury trial, the defendant was found guilty of second degree murder (720 ILCS 5/9-2(a)(2) (West 2020)). The trial court subsequently sentenced him to 18 years' incarceration in the Illinois Department of Corrections (IDOC). On appeal, the defendant argues that the trial court erred when it excluded evidence of the victim's two convictions for domestic battery. He further argues that the trial court erred when it sentenced him to an excessive term of 18 years' incarceration. For the following reasons, we affirm the defendant's conviction and sentence.

1

¶ 3                                    I. BACKGROUND

¶ 4      On July 22, 2021, in Macon County case No. 21-CF-862, the defendant, Paul D. Outland,

was charged with three counts of first degree murder in connection with the death of Anthony

Jones on July 19, 2021. The State later dismissed two of the three counts. Following his arrest, the

defendant claimed to police that he acted in self-defense. He maintained this claim throughout the

proceedings.

¶ 5      On August 8, 2022, the State filed a motion *in limine* requesting the trial court bar the

defense from presenting evidence at trial of, *inter alia*, Jones's two Macon County convictions for

domestic battery in case Nos. 18-CF-1590 and 18-CM-567. At the hearing on the motion on

November 2, 2022, the State argued that because the entire altercation between the defendant and

Jones in this case was captured on video, there were not conflicting versions of what occurred

between them, and the introduction of the evidence was, therefore, unnecessary. It averred that the

domestic battery convictions stemmed from "relatively minor incidents" involving Jones's current

girlfriend and the felony conviction was based on the misdemeanor conviction being a "prior."

Defense counsel argued that there was still a dispute about what happened prior to and during the

altercation. The trial court stated it carefully reviewed the videos of the incident. It reserved its

ruling pending its consideration of the evidence at trial, stating that if the defendant testified or

there was other evidence that Jones was the aggressor, and Jones's prior domestic battery

convictions showed similar conduct, it was inclined to allow the evidence. It further stated that it

would exclude the evidence "if everybody again is just going to argue in terms of what occurred

on the videotapes." At the subsequent jury trial, the trial court granted the State's motion *in limine*

and barred the defendant from presenting evidence of Jones's convictions. It indicated that the

videos were the best evidence of what occurred during the altercations between the defendant and

                                            2

Jones and found "the great weight of the evidence" supported the State's theory that the defendant was the initial aggressor and that Jones's convictions were irrelevant as they had "nothing to do with these two people other than Mr. Jones," and were too remote in time.

¶ 6     The jury trial commenced on November 14, 2022. In testifying for the State, Dustin Cain testified that he and the defendant were part of a group of homeless people who gathered each morning to wait for the opening of the Oasis Day Center in Decatur, Illinois. He also knew Jones. On July 19, 2021, at around 6:30 a.m., Cain and his girlfriend, Mary Kilcrease, waited with the defendant and a few other people at a nearby church for the center to open. Cain saw the defendant walk quickly toward Jones who was approaching from the opposite direction. He then saw the two men get into "a little slap box fight." He did not see who hit whom first because he was too far away. Cain then ran to break up the fight, but the defendant was already walking away. Cain asked Jones, who was in the road spitting something out of his mouth, if he was okay. Jones looked at Cain and answered in the affirmative. Cain then walked away from Jones back to where Kilcrease was waiting. The State then played a video recording of the area at the time of the altercation. Cain identified himself, Jones, and the defendant in the video.

¶ 7     Mary Kilcrease testified that on July 19, 2021, at 6 a.m. or 6:30 a.m., she, Cain, the defendant, and some other individuals were waiting for the Oasis Day Center to open. She knew both Jones and the defendant. Kilcrease observed the defendant walk toward Jones as Jones was approaching from the opposite direction. She saw the defendant strike Jones, but nothing more. She later learned that Jones had died.

¶ 8     Bettina Ryan testified that she worked at the Oasis Day Center in July 2021. She was familiar with both the defendant and Jones. At 6:20 a.m. on July 19, 2021, as she was nearing the center in her car, she noticed the defendant's ponytail. When she looked to her left, she saw the

3

defendant had his fist drawn back and Jones had his hands up and palms open as if he were defending himself. Ryan did not see anyone punch the other and did not see who started the altercation.

¶ 9    Michael Kelton testified that he was working as a bus driver for Decatur Public Transit at 6:20 a.m. on July 19, 2021. At that time, he saw a "glimpse" of the defendant running. He then looked to his left and observed the defendant lunge and reach for Jones as the defendant threw a punch. Jones appeared scared. At the time, Kelton thought "it was just a regular street scuffle."

¶ 10    Kelton's bus had a front dashboard camera recording for the time of the altercation. The State published it at both full and half speeds while Kelton narrated what he had seen. However, he saw more than the video showed because the camera recorded straight ahead, but he had looked to his left to see better what was transpiring. Later that same day, Kelton saw the defendant at the transit center. The defendant was wearing different clothes than he wore at the time of his altercation with Jones.

¶ 11    Dewanda Matthews testified that on the date in question, she observed a lighter-skinned man lunge and throw a punch at a black man as the two crossed an intersection from opposite directions. The black man threw up his hands as if he wanted the other man to stop. Matthews did not see the black man punch anyone. Matthews opined that the light-skinned man started the fight. In court, Matthews identified the light-skinned man as the defendant.

¶ 12    David Rasche testified that on July 19, 2021, he was driving at approximately 6:20 a.m. when he saw a man lying on the ground. As Rasche got closer to the man, he could see that the man "had his head up a little bit, but he was lying down." Initially, he thought the man was passed out drunk. However, as he passed the man, he saw a lot of blood, and the man "kind of fell down." Rasche turned around in a nearby parking lot, called 911 and returned to where the man was lying.

4

He got out of the car and walked in front of the man. At that point, "it didn't appear to me that he was alive at that point." Rasche waited with the body until the police arrived.

¶ 13    Dr. Scott Denton performed the autopsy on Jones. He determined that Jones bled to death as a result of a knife wound to the neck that entered on the left side, passed through his voice box, cut the right jugular vein, and then exited out the right side. Dr. Denton opined that the wound was likely caused by a thin, single-edged, one-inch-wide kitchen knife that tapered to eight-tenths of an inch and was longer than three inches. The physician also testified that Jones's blood contained a large level of methamphetamine at the time of his death which indicated that he probably recently used the substance.

¶ 14    Detective Jason Kuchelmeister testified and identified multiple video recordings pertaining to the investigation of the altercation. One of the recordings depicted the defendant at the transit center around 6:40 a.m. on July 19, 2021. He was wearing different clothes in that video than the clothes he was wearing in the videos of the altercation with Jones.

¶ 15    Detective Jason Danner testified that the defendant told him that Jones came at him and he then acted in self-defense. Detective Jason Derbort testified that he documented the crime scene and identified photographs he took of it. He did not recover a knife or any other weapon from the scene. The State rested.

¶ 16    The defendant testified on his own behalf. He testified that on July 19, 2021, he had been homeless in Decatur for about a year and a half. While homeless, he was the victim of several crimes. As a result, he kept his personal items in a book bag that he kept in an alley. On the night of July 18, 2021, the defendant and some friends were talking outside a church. He saw a younger black man and woman whom he did not know walk past. A few minutes later, the defendant and a man named Adam, who had been standing with the defendant, saw the woman walking alone.

5

They thought it was peculiar that the woman was alone and appeared not to want anyone to see her face. Adam left to check on his and the defendant's bags that were on the other side of the church. While Adam ran directly to the church steps, the defendant ran through the alley and around the church to cut off anyone who may have been leaving with his and/or Adam's bags. When the defendant got to the other side of the church, he saw the black man, who had taken their bags, scuffling with Adam. The man dropped the bags and ran. The man then collided with the defendant and the two fell. The man got up and ran, leaving his phone behind. The defendant was vigilant for the rest of the night. When he awoke on July 19, 2021, he was still thinking about the attempted bag theft and worried about who might come around.

¶ 17    The defendant crossed the street and went to the east of the church's stoop area where Cain and Kilcrease arrived about five minutes later. He was familiar with Cain but did not consider him to be a friend. The defendant then left and tried to cross the street. He thought he could safely run across, but he misjudged, and cars started honking at him. When the defendant was almost across the street, Jones ran up to him. Defendant had not seen Jones before stepping into the intersection. Jones then threw a punch that grazed the defendant's chin and tried to "grapple" him around the waist. This action caused the defendant to believe he needed to defend himself against serious harm. Initially, the defendant thought Jones was the man who attempted to steal his bag the previous night and thought he might be retaliating. However, he realized a couple minutes into the altercation that Jones was not that man. The defendant grabbed from his pocket a piece of metal that he found the night before. He balled up the piece, which was triangular-shaped and about five inches long and 1½ inches wide, in his fist. He saw Jones "maybe looking for an object or looking in his waistband" with his right hand. The defendant then tried to hit Jones with a straight punch while clenching his fist around the metal object. His fist made contact with Jones's chin and Jones

6

fell to the ground. The defendant then walked away and headed to the bus station. He changed clothes before leaving for the bus station because he was going to work. None of the clothing he took off had blood on it. He did not know Jones was bleeding or seriously injured until he saw on the 5 p.m. news that Jones had died.

¶ 18    The defendant believed it was possible that the piece of metal in his fist cut Jones, but the defendant did not purposely try to stab or cut him. The fight was not intentional or premeditated. Rather, the defendant simply threw an "inadvertent" punch in an attempt to keep Jones away from him. The defendant was fearful for his life and thus he defended himself against Jones. He felt safe and left the area once he saw Jones fall. He denied that Jones ever held up his hands as if he were retreating at any point during the altercation.

¶ 19    Candice Mitchell testified as a rebuttal witness for the State, over defense counsel's objection. She testified that she was Jones's fiancée and the two had a child together. Mitchell knew the defendant from the Oasis Day Center. He had been to her house around four times in order to smoke methamphetamine and crack with Jones. In surrebuttal, the defendant denied ever having been to Mitchell's home and using drugs with Jones there.

¶ 20    At the close of the evidence, the trial court gave the jury instructions for first degree murder, self-defense, second degree murder, and involuntary manslaughter. After deliberations, the jury found the defendant guilty of second degree murder.

¶ 21    On December 9, 2022, defense counsel filed a motion for a judgment notwithstanding the verdict, or, in the alternative, a new trial, arguing, *inter alia*, that the court erred in denying the admittance of Jones's domestic battery convictions as *Lynch* evidence. After a hearing on the motion on December 19, 2022, the trial court denied the motion. In so doing, it stated, in relation to the purported *Lynch* evidence:

7

"The case law is pretty clear that *Lynch* material can only become relevant if there's no reasonable explanation in terms of what occurred in this particular case.

Here we had a number of videos showing exactly what occurred in this case. The prior convictions were both domestic convictions. They were remote in time. They were totally different fact wise. I don't think they were germane. I don't think they were relevant. And again, we've a videotaped explanation as to exactly what occurred."

¶ 22 After denying the defendant's aforesaid motion, the trial court proceeded with the sentencing hearing. The State introduced victim impact statements from Jones's fiancée and brother as evidence in aggravation. The defendant presented the testimony of his friend, Tanna Hammel, who testified she had known the defendant for more than 30 years and never knew him to be violent. The defendant also gave a statement in allocution. He stated that he "didn't mean for this altercation to go any farther than a just a fight." He further stated that he did not hide after the altercation and "was unaware of everything until five o'clock when I seen [*sic*] it on the news." The defendant expressed remorse that the fight had gone "as far as it did" and described it as a "bad situation for everybody."

¶ 23 The State recommended that the defendant be sentenced to 20 years' incarceration. In support, it argued that probation would deprecate the seriousness of the offense, especially in light of the fact that the defendant was not cooperative with the probation officer's preparation of the presentence investigation report (PSI). It further argued that the facts of this case were at the worst end of the second degree murder "continuum," the defendant's criminal history was not great, and his two most recent convictions were for battery offenses, one of which was similar to the instant case as it too occurred near the Oasis Day Center and was precipitated by "an argument over potentially having K2 stolen."

8

¶ 24    Defense counsel recommended that the defendant be sentenced to eight years' incarceration. In support, he argued that the defendant never denied being involved in Jones's death or tried to avoid responsibility. He further argued that the defendant's criminal history was not "bad." Counsel averred that the defendant's most recent felony conviction occurred "over ten years ago," his last felony conviction before that conviction occurred "over 20 years ago," and his last felony conviction before that conviction occurred "over 30 years ago." Counsel opined that the defendant's most recent battery convictions did not show a dangerous pattern, but rather "they show someone who's living as homeless defending themselves."

¶ 25    The trial court sentenced the defendant to 18 years' imprisonment in IDOC, followed by one year of mandatory supervised release. In rendering its decision, it stated it had considered "the facts of this case, the factors in aggravation and mitigation, and the Presentence Investigation Report." It agreed with the State that the facts of the case indicated the offense was more on the serious end of the second degree murder spectrum. It stated that, according to the pathologist's report, "a knife or other object was put all the way through Mr. Jones's neck[,] literally running from one side to the other." The court opined that "we cannot lose sight of the fact that a man lost his life in this particular case and Mr. Jones's family has suffered and will continue to suffer due to [the defendant's] actions." It noted that although most of the defendant's criminal history was old, the defendant had six prior felony convictions as well as six prior battery or assault convictions. It acknowledged that the defendant took "some limited acceptance of responsibility." It stated that it thought the fact that the defendant would serve his sentence at 50 percent was "significant." The trial court found "that a sentence of Probation would deprecate the seriousness of the defendant's conduct" and "a sentence to the Illinois Department of Corrections is necessary

9

to protect the public." The court then advised the defendant of his appeal rights. The defendant now appeals.

¶ 26                                    II. ANALYSIS

¶ 27    The defendant first argues that the trial court violated his constitutional right to present a defense when it denied his presentation of evidence of Jones's two domestic battery convictions to show Jones's violent character. He avers that he should have been permitted to offer the evidence under *People v. Lynch*, 104 Ill. 2d 194 (1984), because he asserted that he acted in self-defense and Jones's aggressive and violent character was relevant to show who was the aggressor in the altercation. He opines that Jones's character was circumstantial evidence that could have provided the jury with additional facts to help it decide what really occurred.

¶ 28    The defendant asserts that the trial court abused its discretion for several reasons. He first argues that the court's comments showed it was either unfamiliar with or did not understand the *Lynch* holding. He avers that the evidence should have been admitted because he testified that he acted in self-defense and that Jones was the initial aggressor, so the court was incorrect to find that it was "unfair" to introduce evidence of Jones's aggressive or violent nature. Citing *Lynch*, 104 Ill. 2d at 200-01, the defendant further argues that he "was entitled to have the jury judge the reasonableness of his behavior in light of all the relevant facts."

¶ 29    The defendant argues that the domestic battery convictions qualified as proper *Lynch* material in every manner necessary. He avers that the convictions were for crimes of violence and admissible to show that Jones was the initial aggressor and it did not matter that Jones's convictions had nothing to do with him. He further argues that Jones's 2018 convictions were not too remote in time as they both were entered within three years of the July 19, 2021, altercation between him and Jones.

10

¶ 30    The defendant also argues that the court's conclusion that "the great weight of the evidence" supported that he was the initial aggressor was both erroneous and immaterial. He avers there were conflicting accounts as to who the aggressor was. He opines that the witnesses, aside from Kilcrease and Matthews, indicated that they did not see who started the altercation and that the defendant's testimony that Jones was the initial aggressor contradicted Kilcrease's and Matthews's testimonies. The defendant argues that the trial court's conclusion that the evidence weighed in the State's favor was immaterial because it was the jury's province, not the court's, to determine whether he acted in self-defense. He avers that the fact that parts of the altercation were captured on video did not render the convictions unnecessary because none of the recordings were unobstructed enough for the jury to see everything that occurred, and none allowed the jury to see exactly what he saw from his point of view.

¶ 31    The defendant further argues that the trial court's error likely contributed to his conviction because the jury did not hear, and thus could not consider, Jones's propensity for violence. He avers that without corroboration by the excluded evidence, the jury was less likely to believe his account. The defendant opines that the jury's guilty verdict on second degree murder reflects a finding on the jury's part that he feared for his life when he punched Jones. He avers that this partial crediting of his account makes it less likely the error was harmless.

¶ 32    In response, the State argues that the trial court did not abuse its discretion when it excluded evidence of Jones's domestic battery convictions. It avers that the evidence was unnecessary given that the videos provided an objective view of the events in question. It further argues the convictions were too remote in time to "add anything" or "help explain the case" and stemmed from minor incidents.

11

¶ 33    In the alternative, the State argues that if error did occur, it was harmless. It avers that the evidence at trial clearly supported the jury's finding that the defendant's conduct constituted murder and there is no reasonable probability that the outcome of the trial would have been different had the purported *Lynch* evidence been admitted. It opines that the videos show that the defendant ran through several lanes of traffic to attack Jones, and that after a brief struggle and conversation, Jones was fatally stabbed while backing away. It avers that the defendant's conduct following the altercation of walking away from an injured Jones demonstrated a consciousness of guilt as did his later claims of not knowing Jones and of having mistaken him for someone else. It argues that the defendant's claim that he accidentally cut Jones was belied by the nature of Jones's injuries.

¶ 34    A trial court's decision to exclude evidence is reviewed for an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). An abuse of discretion occurs when the court's decision is arbitrary, fanciful, or unreasonable. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). Under *Lynch*, when a defendant asserts self-defense, he may offer evidence of the alleged victim's aggressive or violent tendencies for two purposes: (1) to show the defendant's state of mind or (2) "to show who was the aggressor." *Lynch*, 104 Ill. 2d at 199-202. Here, the defendant sought to introduce the evidence for the second purpose. "Convictions for crimes of violence, such as *** convictions for battery, are reasonably reliable evidence of a violent character." *Id.* at 201. "Where the victim's propensity for violence is in question, *** the danger of prejudice to the defendant lies in refusing to admit such evidence, while its high degree of relevance and reliability remains constant." *Id.*

¶ 35    Here, the defendant claimed the incident occurred as a result of self-defense, and there was some question as to who was the aggressor. We agree with the defendant that none of the recordings were clear enough for the jury to see everything that transpired. More importantly, none

of the recordings allowed the jury to see exactly what the defendant saw because none were from his particular point of view. As stated in *Lynch*, "To decide what really occurred the jury needed all the available facts, including evidence of [the alleged victim's] prior convictions for battery." *Id.* at 200. Thus, we find that the trial court abused its discretion when it denied evidence of Jones's domestic battery convictions.

¶ 36    However, "even where evidence of the victim's propensity for violence should have been admitted, reversible error does not always occur if a trial court improperly excludes it." *People v. Martinez*, 2021 IL App (1st) 182553, ¶ 48. "[S]uch error is not reversible when it amounts to harmless error ***." *Id.* The State bears the burden of proving, beyond a reasonable doubt, the error was harmless. *People v. Nitz*, 219 Ill. 2d 400, 410 (2006). In other words, the State must "prove that the jury verdict would have been the same absent the error to avoid reversal." *People v. Crespo*, 203 Ill. 2d 335, 347 (2001). We find the State has done so here.

¶ 37    Both Dewanda Matthews and Michael Kelton testified that they saw the defendant lunge at Jones. Matthews and Bettina Ryan observed Jones with his hands up in a way that appeared to indicate that he wanted the defendant to stop fighting. Kelton also saw the defendant throw a punch at Jones and Mary Kilcrease observed the defendant strike Jones. Moreover, Dr. Denton's finding that Jones bled to death as a result of a knife wound that extended from the left side to the right side of Jones's neck, passing through his voice box and cutting his right jugular vein, indicated that Jones's fatal injuries were much greater than they would have been had Jones been inadvertently cut by a piece of metal. Dr. Denton's posit that the weapon used to cut Jones was a thin, single-edged, one-inch-wide knife that was longer than three inches and tapered to eight-tenths of an inch further belied Jones having been inadvertently cut. Even had Jones's convictions been admitted, we find that the other evidence was overwhelmingly against the defendant to such

13

an extent that we cannot say that there is a reasonable probability that the jury's verdict would have been different.

¶ 38    The defendant next argues that his 18-year sentence is excessive because the trial court improperly considered Jones's death as one of the factors in aggravation and death is inherent in the offense of murder. He avers that the court was more focused on the defendant's conduct resulting in Jones's death than either the force employed or the manner causing death. The defendant argues that the record reveals that the court relied upon the serious harm factor in imposing the sentence because it was the only factor the court named other than the defendant's criminal history. He further argues that the court's imposition of a near-maximum sentence made it less likely that the court's reliance on the improper factor was insignificant.

¶ 39    In response, the State argues that the trial court did not abuse its discretion when it sentenced the defendant to 18 years' incarceration. It avers that it did not argue that the defendant's conduct caused or threatened serious harm as an aggravating factor which indicates the court did not consider it. It further argues that the court's isolated observation that "a man lost his life in this particular case" does not indicate that the court was unfamiliar with the "double-enhancement rule." It avers that when taken in context, the court's statement was addressing the fact, as stated by the court, that "Jones's family ha[d] suffered and will continue to suffer" as a result of the defendant's actions. It opines that it was not improper for the court to note and consider that Jones had been stabbed through the neck, given the brutality of the crime.

¶ 40    A single factor cannot be used both as an element of an offense and as a basis for imposing a "harsher sentence than might otherwise have been imposed." *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992). A court's consideration of the fact that a defendant's conduct caused death or serious harm as a sentencing factor in a homicide case is not proper because death is inherent in the offense.

14

See *People v. Saldivar*, 113 Ill. 2d 256, 272 (1986). "In considering whether a sentence was properly imposed, a reviewing court should not focus on a few words or sentences of the trial court, but should consider the record as a whole." *People v. Newlin*, 2014 IL App (5th) 120518, ¶ 23 (citing *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986)). "It is unrealistic to suggest that the judge sentencing a convicted murderer must avoid mentioning the fact that someone has died or risk committing reversible error." *People v. Barney*, 111 Ill. App. 3d 669, 679 (1982). While the sentencing court's consideration of the victim's death in aggravation is improper in a murder case, "the trial court may consider the force employed and the physical manner in which the victim's death was brought about, which comprehends the degree or gravity of defendant's conduct rather than the end result, that is, the death of the victim." *People v. Kibayasi*, 2013 IL App (1st) 112291, ¶ 55. In this case, while the court mentioned Jones's death, it did so in only a few words and in the context of the loss to his family. Moreover, it permissibly mentioned the manner in which Jones's death was brought about. We find that, when taken as a whole, the record does not support the defendant's argument that the court considered an improper factor when it sentenced him.

¶ 41    The defendant next argues that his sentence is excessive because the trial court failed to adequately weigh his rehabilitative potential. He avers the court did not comment on his rehabilitative potential when imposing his sentence and seemed focused only on punishment and/or deterrence. The defendant further argues that the court should have analyzed the factor that the circumstances of this incident are unlikely to recur as the crime was motivated by the defendant's fear for his own personal safety.

¶ 42    In response, the State argues that the defendant's rehabilitative potential was not entitled to greater weight than the seriousness of the offense. It further argues that the court emphasized the defendant's extensive criminal history which suggested that his rehabilitative potential was not

15

good. The State avers that the court also stated that it considered, *inter alia*, the defendant's PSI which addressed the defendant's rehabilitative potential.

¶ 43 Regarding the defendant's argument that the trial court failed to give proper weight to the consideration that the circumstances were unlikely to recur, the State argues that the PSI, which the trial court stated it had reviewed, indicated that he was convicted of battery in 2017 and 2018. It avers that because of these battery convictions, it was reasonable for the trial court to conclude that a lengthy sentence was necessary in light of the defendant's criminal history and potential for recommitting a similar offense.

¶ 44 A sentence that falls within the statutory limits is presumed to be proper and is reviewed for an abuse of discretion. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50. An abuse of discretion will be found only where the sentence imposed is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). Because the defendant included in his motion to reconsider sentence that "the trial court failed to give adequate consideration to mitigation evidence presented," his stated sentencing issues are preserved. See *People v. Burnett*, 237 Ill. 2d 381, 387 (2010).

¶ 45 A defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense. *People v. Coleman*, 166 Ill. 2d 247, 261 (1995). A "defendant's history and character are primary considerations when evaluating a defendant's rehabilitative potential." *People v. Cetwinski*, 2018 IL App (3d) 160174, ¶ 69. "Where the sentencing court examines the presentence report, it is presumed that the court took into account the defendant's potential for rehabilitation." *People v. Gutierrez*, 402 Ill. App. 3d 866, 900 (2010). Here, the defendant has not overcome that presumption. The court stated that it considered the PSI and emphasized the

16

defendant's extensive criminal history which indicates that it considered the defendant's potential for rehabilitation.

¶ 46    Regarding the defendant's argument that the trial court failed to analyze the mitigating factor that the circumstances were unlikely to recur, "[w]e presume a trial court has considered all of the relevant factors of mitigation before it." *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27. To overcome that presumption, the defendant must present *affirmative* evidence that the court failed to consider mitigating factors. *Id.* Moreover, the mere existence of mitigating factors does not require the trial court to impose the minimum sentence allowed, nor does it preclude the imposition of the maximum sentence. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). Rather, the trial court must balance all relevant factors in reaching its determination of the appropriate sentence. *Id.* The most important factor to be considered when determining the appropriate sentence is the seriousness of the offense. *Id.* at 159. Without question, the gravity of the offense here was great. Here, the defendant has not pointed to anything affirmative in the record to indicate that the court did not weigh the recurrence factor in its sentence determination. "The trial court's sentence is given great deference, as 'the trial court is in the best position to consider the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age.' " *People v. Deleon*, 2025 IL App (1st) 211454, ¶ 55 (quoting *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15). As the reviewing court, it is not our place to reweigh the evidence and substitute our judgment for that of the trial court. *Stacey*, 193 Ill. 2d at 209. The defendant asks us to do just that, and we decline.

¶ 47                          III. CONCLUSION

¶ 48    For the foregoing reasons, we affirm the defendant's conviction for second degree murder as well as his sentence of 18 years' imprisonment.

17

¶ 49    Affirmed.