2025 IL App (1st) 241265-U

No. 1-24-1265

Order filed December 30, 2025

SECOND DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | No. 20 CR 05282 |
| v. | ) ) | Honorable |
| CALVIN DOSS, | ) ) | Stanley J. Sacks, Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE D.B. WALKER delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's evidentiary orders were not erroneous. The evidence presented was sufficient to defeat defendant's self-defense claim and does not require that defendant's conviction be reduced to second degree murder.

¶ 2    On April 5, 2020, Defendant Calvin Doss (Defendant) shot and killed Vanessa Thomas, who was his girlfriend and the mother of his child. Defendant turned himself in to the police but claimed that he shot Thomas in self-defense. Defendant was found guilty of first-degree murder and sentenced to 50 years' incarceration. On appeal, he argues that (1) the court erred

by allowing some of the State's proposed evidence to be admitted, (2) the court erred by denying defendant's request to admit certain other evidence, and (3) that the evidence presented by the State was insufficient to disprove any of the required elements of his self-defense claim beyond a reasonable doubt.

¶ 3                                  I. BACKGROUND

¶ 4        On either April 6 or 7, 2020,[1] defendant turned himself in to police, stating that he was responsible for the shooting death of Thomas. Defendant was charged with six counts of first-degree murder.

¶ 5                              A. Proof of Other Crimes

¶ 6        On February 3, 2023, the State moved to admit evidence of five prior acts of domestic violence committed by defendant. The motion described the incidents as follows:

> "[1.] The People seek to introduce evidence that on March 14, 2020, the defendant and the victim along with two minor children were in the parking lot of a fast-food restaurant in Chicago. An argument ensued between the victim and the defendant and the defendant struck the victim in the head. The two minor children came to the defense of their mother and the defendant threw them to the ground and struck them as well. An unrelated bystander saw the incident and came to the defense of the victim and the minor children and the defendant fled the scene. The matter was reported [to the Chicago Police Department]. * * *
>
> [2.] The People also seek to introduce evidence that on December 23, 2013, the defendant was in a dating relationship with Michaela Blaye. They both were at an

---

[1] The parties reference different dates in their briefs, but which date is correct is immaterial to the case and our analysis.

apartment * * *, along with Michaela Blaye's brother. The defendant and Michaela got into a verbal argument and then defendant began striking Michaela Blaye about the body. Michaela Blaye's brother came to the defense of his sister and the defendant then struck him. The matter was reported [to the Chicago Police Department]. * * *

[3.] The People also seek to introduce evidence that on August 29, 2012, the defendant was with Michaela Blaye. *** The defendant saw a phone number on *** Michaela Blaye's phone. The defendant then struck Michaela Blaye in the eye and took her property. This incident was reported [to the Chicago Police Department]. * * *

[4.] The People also seek to introduce evidence that on July 11, 2010, the defendant was with Michaela Blaye. Michaela Blaye told the defendant that they were no longer in a relationship. The defendant responded by punching Michaela Blaye in the eye. Officers were called and observed injuries on Michaela Blaye's face and eye. This matter was reported [to the Chicago Police Department]. * * *

[5.] The people also seek to introduce evidence that on November 27, 2007, the defendant was with his girlfriend, Sigourney Sanders. Signourney Sanders was seven months pregnant with the defendant's child at the time. While in their bedroom, defendant got on top of Signourney Sanders and placed a blanket over her head, limiting her breathing. This matter was reported [to the Chicago Police Department]. * * *"

¶ 7    On September 18, 2023, the court denied the State's motion with regard to incidents 3, 4, and 5. The court granted the motion as to the incident with Thomas a few weeks before the offense and as to the incident with Michaela Blaye in 2013, reasoning that those two incidents

3

were recent enough to show propensity to commit domestic violence. The State ultimately only introduced evidence regarding the March 14, 2020 incident involving Thomas.

¶ 8        B. Evidence of Aggressive and Violent Character of the Victim

¶ 9        On May 4, 2023, defendant moved to introduce evidence of Thomas' aggressive and violent character under *People v. Lynch*, 104 Ill. 2d 194 (1984). In that motion, defendant described two instances of such behavior:

> "1. The defendant had called [LaEasha Johnson on the morning of the murder] to request she purchase McDonald's and bring it to his father's home * * *. Ms. Johnson had a continuing romantic/close friendship with [defendant], of which the deceased, Vanessa Thomas, was aware. Ms. Johnson's friend, Ivy[2], picked Ms. Johnson up at her home and took her to [defendant's] father's home. Ivy pulled up next to a car across from the one Ms. Thomas occupied. As [defendant] approached the vehicles, the evidence will show that Ms. Thomas exited the vehicle, approached Ms. Johnson's vehicle, opened the passenger door, where Ms. Johnson was sitting, and struck Ms. Johnson repeatedly with her fist. Ms. Thomas also repeatedly said, "I'm going to kill you." [Defendant] pulled Ms. Thomas out of and away from the vehicle. Ivy and Ms. Johnson then left.
>
> 2. On approximately June 2, 2019, the defendant was not living with Ms. Thomas, but they were dating. [Defendant] was at Ms. Thomas' residence near Washington and Austin in Chicago, when the two got in an argument. Ms. Thomas retrieved a kitchen knife from the kitchen and stabbed [defendant] in the arm. [Defendant] ran to the bathroom, with Ms. Thomas trailing him saying she was going to kill him. An

---

[2] This individual is referred to as Ivory elsewhere in the record, including in LaEasha Johnson's testimony.

ambulance took the defendant to Cook County Stroger Hospital, where he received 26 stitches. * * * Ms. Loretta Kent, the defendant's mother, saw the defendant at the hospital * * *.

¶ 10     On May 12, 2023, defendant filed a supplemental motion seeking to introduce the following third instance of Thomas' alleged aggressive and violent behavior:

"Cherish Hollings – would testify that the deceased worked for Aries Transport, located at O'Hare Airport, as a dispatcher. She knew Ms. Thomas, the deceased.

In the period of time within one year of Ms. Thomas' death, Ms. Thomas would call dispatch and accuse Ms. Hollings of having engaged in sexual intercourse with the defendant, Calvin Doss. Ms. Thomas threatened to come to Ms. Hollings work location and "kick her ass". Ms. Thomas also stated that because she had been an employee of Aries Transport, she would have access to Ms. Hollings['] work location.

Ms. Thomas called back approximately 30 more times asking to speak to Ms. Hollings. Ms. Hollings eventually spoke telephonically to Ms. Thomas, and Ms. Thomas stated that she was contemplating killing [defendant] because he was sleeping with Ms. Hollings. Ms. Thomas then told Ms. Hollings she had previously stabbed [defendant].

Ms. Hollings convinced Ms. Thomas that she had not had a relationship with [defendant] and the threats then ended."

¶ 11     At the same September 18, 2023 hearing in which the court addressed the other crimes evidence, it also addressed the *Lynch* evidence. The court denied defendant's motion with regard to the alleged statements to Hollings, finding that threatening to "[k]ick her ass" was "a veiled, if at all, threat." The court did not address Thomas' alleged statement to Hollings that

she should kill defendant. The court allowed the other two pieces of *Lynch* evidence on the condition that the defense could elicit testimony from someone with personal knowledge of the events.

¶ 12                                                  C. Trial

¶ 13        The State's first witness was Dionna Applegate (Applegate), Thomas' mother. Applegate testified that after Thomas' death, she went to Thomas' apartment to retrieve clothing for Thomas' children. In a tote containing clothing, she found a handgun. She "put it up away before the kids could get ahold of it." The handgun was later retrieved by evidence technician Eric Gonzalez, who testified that it was empty of any rounds when it was recovered. The parties stipulated that an expert would testify, if called, that the handgun Applegate found matched the empty casing found at the crime scene and the bullet found inside Thomas, "to the exclusion of all [other weapons]." The parties stipulated to DNA evidence that established, to an extreme degree of likelihood, that the handle and trigger bore the DNA of Thomas, defendant, and an unknown third person.

¶ 14        The parties also stipulated as to the condition of Thomas' body: Thomas was 5'1" tall and weighed 174 pounds. She had a gunshot entry wound at the crown of her head, the bullet from which lodged in the soft tissue of her neck. The bullet had proceeded straight downward from the top of her head, with no left or right deviation. Thomas also had a gunshot wound to her right breast, the bullet from which exited through her back. That bullet traveled front to back, slightly left to right, and slightly upward relative to Thomas' body.

¶ 15        Evidence technician Ashley Hein testified that two live rounds, a shell casing, and Thomas' phone were found near Thomas' body.

¶ 16     Detective Salvatore Aloisio (Aloisio) testified that he recovered Thomas' cellphone at the scene and was able to access it by getting the pin number from one of Thomas' family members. On the phone, Aloisio discovered three videos taken between 4:21 a.m. and 4:29 a.m. Officer Paul Pulownik later recovered the videos from the cellphone. Those videos were played in court during trial.

¶ 17     The first video had the file name IMG_0036.MOV and the recording began at 4:21:30 a.m. At the start of the video, defendant approaches Thomas with a black handgun held sideways in his hand and not pointed at Thomas. He repeatedly demands that Thomas leave the apartment and seems to push lightly at Thomas or the phone she is using to record the video. Thomas and defendant move to opposite sides of the combination living room/kitchen while Thomas chides defendant for being caught with another woman and defendant insists that he's a good person and that his love is for Thomas, not for the other woman. While the two argue, defendant places the handgun in the sink and turns on the water. Thomas informs him that "that's not how you clean prints off a gun." Thomas advises defendant to be careful, as there's a round in the chamber. Defendant retorts that Thomas "never locked and loaded it," and Thomas responds by stating "you just did." Thomas states that she's taking the video to send to the police later. She also tells defendant that she "learned her lesson last time" before stating "I'm not putting my hands on no—" at which point the video cuts off.

¶ 18     The second video had the file name IMG_0037.MOV and the recording began at 4:25:47 a.m. In that video, defendant can be seen packing things in a large, lidless blue plastic tote while he and Thomas continue to argue. Thomas informs defendant that she does not want any of his things and that someone else will provide her with a television. Thomas accuses defendant of having asked other men to come over and fight her after a previous disagreement

between the two of them. Thomas accuses him of letting one of those men "run up on her" while she was holding her child, and further accuses him of later hanging out with that same man as if nothing were wrong.

¶ 19    The third video had the file name IMG_0038.MOV and the recording began at 4:28:52 a.m. At the start of that video, defendant is attempting to move a large flatscreen tv down the interior stairs of the apartment while Thomas tells him that he's breaking his own television, to which he responds by displaying his middle finger at Thomas. Thomas, who was filming from directly above defendant, circles around the banister to stand at the top of the stairs, where she tells him that he'll "regret all of this tomorrow." Thomas turns on a light on the stairway and a black handgun can be seen at the bottom of the stairs. Once defendant reaches the bottom, he picks up the handgun and stows it in his waistband. Defendant climbs the stairs again, and Thomas responds by once again walking away to maintain distance. From across the room, tells defendant, "I'm not doing anything. I'm just waiting for you to get your stuff." Defendant asks if he can come get his things the next day, and Thomas tells him no, that his things need to go now. Defendant drags the blue plastic tote of his belongings down the stairs and out the door to the exterior.

¶ 20    The video continues with Thomas standing at the top of the interior stairs, telling defendant that even though he was damaging her property by throwing her expensive shoes outside, she was "being the bigger person" and not damaging any of his property. A small crash can be heard outside, followed by defendant exclaiming, "Oh, sh**!" Thomas proceeds down the stairs to the door between her apartment and outside, where she encounters defendant again and the following exchange occurs:

"DEFENDANT: I'm good, you don't have to do nothing.

THOMAS: Alright, leave.

DEFENDANT: Alright, fu** you.

THOMAS: Alright, bye-bye.

THOMAS: You okay?

DEFENDANT: Yeah, I'm good."

Thomas offers to stand and watch defendant while he takes his things, then continues filming from the top of the exterior stairs. With defendant standing at ground level and Thomas at the top of the stairs, the two argue about whether or not defendant threw her shoes. Thomas then steps inside, closes the door to the exterior, and the video ends.

¶ 21        Harvey Davis (Davis), one of Thomas' children, testified that he was 14 years old, but was 10 years old on the night of March 14, 2020. On that night, Davis was in the back of a car driven by defendant. Thomas was in the passenger seat and in the back with Davis were his cousin, his brother, and defendant's nephew. The occupants of the car had all attended a birthday party and were on the way home. Thomas repeatedly asked defendant to stop so that she could go to the bathroom. Eventually, Thomas urinated a small amount in her seat and defendant became angry with her. Defendant drove a bit further and, upon stopping at a red light, told Thomas to get out and "lightly shoved her out the car." Thomas crossed the street to a fast-food restaurant's parking lot.

¶ 22        Davis testified that defendant kept driving but soon made a U-turn and drove to the parking lot where Thomas remained. Defendant exited the car and Davis saw him "shoving [Thomas] towards the car and, like, pulling her hair." Davis and his cousin exited the car. Defendant grabbed Thomas by the shirt, pushed her toward the car, and pulled her by the hair toward the car. Davis told him to stop touching Thomas and defendant responded by telling him to shut

up. Davis' cousin approached defendant and spoke with him, but Davis did not hear the content of that exchange because he was distracted with concern for his mother's wellbeing. While defendant and Davis' cousin were speaking, a man emerged from a car in the drive-thru lane of the restaurant carrying a metal pipe and demanding that defendant stop putting his hands on Thomas. Defendant got back in the car with his nephew and left. Thomas went into the restaurant with the other children and the police were called.

¶ 23    After the State rested, defendant took the stand to testify in his own defense. He first recounted that he was stabbed by Thomas on June 1, 2019. He arrived home in the early morning, after spending the night out drinking with another woman. He got into an argument with Thomas, who "just picked up a butcher knife and stabbed [defendant]." Defendant fled to the bathroom and hid inside while Thomas attempted to gain entry. Eventually, defendant heard Thomas leave to see to their crying child, at which point defendant fled the home. Defendant lost consciousness on the porch due to blood loss and the next thing he could remember was Thomas standing over him, telling him that she should leave him there to die. Defendant was taken to the hospital and received 26 stitches. Defendant testified that, because he did not want to get Thomas in trouble, he told the doctors at the hospital that he had been robbed in an alleyway.

¶ 24    Defendant testified that earlier in the night during which Thomas would eventually be shot, he went to his father's house for a weekly poker game. Defendant was so drunk that he called Thomas to pick him up when the event concluded in the early hours of the morning. Defendant also called Johnson, asking her to bring him some food. The two women arrived at approximately the same time. Thomas told defendant that her car was making a strange noise, so they should take his car home instead. As they were switching cars, Thomas saw Johnson

in Johnson's vehicle and ran over to attack her. Thomas punched Johnson multiple times before defendant grabbed her and "walked her back to [his] truck." Defendant's friend, JR, whose arrival on the scene is not otherwise mentioned, held Johnson back from going after Thomas. Thomas left the scene alone. Johnson left with her friend and JR. After a little time to calm down, defendant got in his own vehicle and went home.

¶ 25     Defendant confirmed the accuracy of the videos recovered from Thomas' cellphone. He stated that she did not normally keep a gun in the home, but when he came in and began packing his stuff, he found her at the counter cleaning and loading a gun. Defendant testified that he asked her if she was going to shoot him, grabbed her by the hair, and took the handgun from her. Defendant confirmed that the handgun seen in Thomas' videos is the same handgun that was recovered by police.

¶ 26     Defendant testified that he was at the bottom of the outside stairs gathering his things while Thomas was inside. Thomas opened the door and began throwing defendant's shoes out the door. While she was throwing his shoes, the handgun fell out of defendant's waistband. Defendant put the gun back into his pants because he did not want Thomas to get her hands on the weapon and shoot him. The gun then fell out of his pants again, and into the tote. Thomas reached for the gun and "came up with it," hitting him in the mouth with it and knocking out some of his teeth. Defendant clarified that at this point he was on the stairs, and she was at the top of the stairs. Defendant wrestled the gun away from her and shot while she was still attempting to get the gun from him. He said he did not know he had hit her, but he was scared that she would kill him if she got the gun. After firing, defendant moved down the stairs and Thomas chased after him. Defendant ended up at the platform where the stairs turned, with Thomas now below him, though how she got ahead of him on the stairs is not explained.

Defendant testified that Thomas was "still coming at [him], so [he] pushed her off and shot again." He repeated that he was afraid and stated that he was in fear for his life. Defendant ran off some distance and Thomas then collapsed.

¶ 27    Defendant stated that he was going to kill himself, so he cocked the slide of the gun back and a live round was expelled. He went back upstairs "for some reason" and "just dropped the gun" and left. He could not recall where he left the gun. He called his sister and his father. He turned himself in on April 6, 2020. Defendant confirmed on cross-examination that he was 6'2" and weighed around 220-30 pounds at the time. He repeated much of the same story on cross-examination. He confirmed that when she came after him after the first shot, she did not have anything in her hands. He described her as being face-to-face with him when he pushed her and fired the second shot. She was "maybe a step down" from him when he fired the second time. Defendant fled down a gangway along the side of the building and Thomas followed, but collapsed, dead. Defendant tried to rouse her and, when he was unable to, called family members. He went back up to the apartment, dropped the gun, and left without taking the tote or television.

¶ 28    LaEasha Johnson (Johnson) testified that, in the early morning hours of April 5, 2020, she accidentally initiated a Facetime call with defendant when she had intended to call her friend Ivory, with whom she planned to go out that night. Although she canceled the call, defendant called back and suggested she come to see him. Shortly thereafter, he called back and asked that she bring him food. Johnson left home in the passenger seat of her car, driven by Ivory. Johnson picked up food and went to defendant's location. Shortly after Johnson arrived, another vehicle parked nearby. Johnson saw defendant and Thomas get out of that vehicle and begin walking toward where Johnson was parked. Johnson received a text from defendant

12

advising her to stay in her vehicle because Thomas was present. The rest of the encounter with Thomas was as previously described: Thomas saw and attacked Johnson and was pulled away. Johnson related that while attacking her, Thomas said, "Bitch, I'm about to kill you" and "I'm about to get you and I'm going to slap the shit out you, hoe." Johnson retrieved a golf club from her vehicle and began to approach Thomas' car, but JR stopped her before she could reach the vehicle. Johnson returned to the vehicle, JR joined her in the vehicle, and Ivory drove the three of them away.

¶ 29     Loretta Kent, defendant's mother, testified that she received a call on June 1, 2019, that her son was in the hospital. Kent recounted defendant telling her the same story about Thomas stabbing him that he told during his testimony. On cross-examination, she confirmed that everything she knew about the stabbing incident, she had learned from her son.

¶ 30     Chaira Doss, defendant's sister, testified that she went to defendant's apartment around 3-4 a.m. on April 5, 2020. She saw a TV on the outside stairs and a blue tote at the bottom of the stairs. She went inside the apartment but found no one inside. After returning outside and looking over the railing, she saw Thomas' body and called 911. She waited at the scene until police arrived but did not remain at the scene to speak with the police.

¶ 31     The parties rested and, after deliberation, the jury found defendant guilty of first-degree murder. On May 28, 2024, defendant received a sentence of 50 years' incarceration. This timely appeal was filed June 7, 2024.

¶ 32                              II. ANALYSIS

¶ 33     Defendant contends that the circuit court erred both in allowing the State to introduce evidence of the prior domestic violence incident involving defendant, as well as in preventing defendant from introducing evidence of Thomas thinking about killing him, as shown in her

13

comments to Hollings while threatening her. Additionally, defendant argues that the evidence presented by the State was insufficient to overcome his affirmative defense of self-defense. In the alternative, defendant requests that, at a minimum, we reduce his conviction to second degree murder because no reasonable trier of fact could conclude that defendant did not possess a genuine fear for his life, even if it was not a reasonable fear.

¶ 34                    A. Evidence of Prior Domestic Violence

¶ 35        The State sought to admit evidence, under section 115-7.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4 (West 2022)), of five incidents of domestic violence perpetrated by defendant. The State ultimately introduced evidence of only one of those crimes, the March 14, 2020 incident, during which defendant allegedly pushed, pulled , and hit Thomas after she urinated in his car. As such, we need concern ourselves only with the admissibility of that evidence.

¶ 36        When a defendant is charged with first or second degree murder and the offense involves domestic violence, section 115-7.4 allows the State to introduce "evidence of the defendant's commission of another offense or offenses of domestic violence," so long as the probative value outweighs the risk of undue prejudice to the defendant. *Id*. The statute states:

> "In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:
>
> (1) the proximity in time to the charged or predicate offense;
>
> (2) the degree of factual similarity to the charged or predicate offense; or
>
> (3) other relevant facts and circumstances." 725 ILCS 5/115-7.4(b) (West 2022).

¶ 37        "The admissibility of other-crimes evidence is within the sound discretion of the trial court, and its decision on the matter will not be disturbed absent a clear abuse of that discretion."

*People v. Dabbs*, 239 Ill. 2d 277, 284 (2010). "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Sloan*, 2024 IL 129676, ¶ 15.

¶ 38        Defendant argues that the incident was not factually similar because (1) defendant was not intoxicated, (2) defendant was not arguing with Thomas about their relationship when the violence occurred, (3) others were present, (4) no gun was used, and (5) no serious injuries were reported. We find this argument wholly unconvincing. The evidence was not presented specifically to demonstrate that defendant is predisposed to committing gun violence while intoxicated and arguing about his relationship in an isolated location. It is being offered to show that there is a history of domestic violence in this case. Without this evidence, the jury would be deprived of crucial context and would be considering the rest of the evidence with no awareness that defendant had committed violence against the victim three weeks before killing her. Defendant's analysis makes no mention of the key factual similarities, namely that the incident concerned the same victim, Thomas, and defendant's anger directed at her for consequences that resulted from his own actions. Given that the incident occurred three weeks before the offense in question, these factual dissimilarities are not enough to render evidence of the incident inadmissible unless its admission would lead to grave prejudice.

¶ 39        Defendant's only contention that the evidence was prejudicial is that other crimes evidence is inherently prejudicial and may have led the jury to find defendant guilty despite what defendant calls strong evidence of self-defense. Defendant cites *People v. Lindgren* for the assertion that "[t]he erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *People v. Lindgren*, 79 Ill. 2d 129, 140 (1980). However, in *Lindgren*, the State was arguing that the defendant had gone on to commit an

arson after the subject murder and introduced extensive evidence regarding that arson. *Id*. at 137. The State's theory in that case was that the arson evidenced a consciousness of guilt and showed that he was in the area around the time the murder was committed. *Id*. There is a great deal of difference between a different crime committed after the offense, as in *Lindgren*, and a similar offense committed three weeks before the relevant offense. That is especially true in this case, given that it involves a specific, narrow statutory carve-out for domestic violence cases, whereas *Lindgren* concerned no such thing.

¶ 40     Defendant's reasoning is not compatible with section 115-7.4(b). Defendant calls the admission wrongful because it is prejudicial but asserts that all such evidence is inherently prejudicial. If our legislature were of the opinion that any evidence of previous domestic violence is so inherently prejudicial that it would tempt a jury to try defendants for the content of their character rather than the evidence presented to them, the carve-out for domestic violence evidence would not exist. The evidence the State presented concerned violence against the same victim on a date quite close to the offense in question. We are therefore not convinced that the decision to admit the evidence was so arbitrary, fanciful, or unreasonable that no reasonable person would make the same decision the court reached in this case. We find that the court did not abuse its discretion by admitting this evidence.

¶ 41                          B. Evidence of Victim's Violent Behavior

¶ 42     Defendant contends that the circuit court erred when it denied defendant's *Lynch* motion to introduce evidence of Thomas' violent and aggressive tendencies to support defendant's self-defense claim. *People v. Lynch*, 104 Ill. 2d 194 (1984). While the circuit court allowed defendant to present evidence that Thomas attacked Johnson and evidence that Thomas previously stabbed defendant in the arm, it denied defendant's request to introduce evidence

16

that Thomas called Hollings, defendant's coworker and threatened her repeatedly because Thomas believed Hollings was in a sexual relationship with defendant. The evidence included proposed testimony from Hollings that Thomas said that she should kill defendant for cheating on her with Hollings.

¶ 43        Under *Lynch*:

"A victim's aggressive and violent character may tend to support a theory of self-defense in two ways. First, the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions and reactions to the victim's behavior. The same deadly force that would be unreasonable in an altercation with a presumably peaceful citizen may be reasonable in response to similar behavior by a man of known violent and aggressive tendencies. One can only consider facts one knows, however, and evidence of the victim's character is irrelevant to this theory of self-defense unless the defendant knew of the victim's violent nature, which is not the case here.

Second, evidence of the victim's propensity for violence tends to support the defendant's version of the facts where there are conflicting accounts of what happened. In this situation, whether defendant knew of this evidence at the time of the event is irrelevant. * * *

We hold that when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it." *Lynch*, 104 Ill. 2d at 199-200.

¶ 44        Rulings on the admissibility of evidence, including in the context of *Lynch* "will not be reversed absent a clear abuse of discretion." *People v. Morgan*, 197 Ill. 2d 404, 455 (2001).

17

¶ 45        The circuit court did not address the prongs of *Lynch* in this case. It did not concern itself with whether defendant was aware of the Hollings incidents, as required for the first prong, or whether there were conflicting witness accounts of the shooting, as required for the second prong. Instead, the court found that Thomas' alleged threat to "kick Hollings' ass" was a "veiled, if at all, threat." The circuit court's phrasing was inarticulate, but we are concerned with the court's decision, not its reasoning. *People v. Reed*, 361 Ill. App. 3d 995, 1000 (2005).

¶ 46        We find a precise eye on the language of *Lynch* is key to this case and provides an opportunity to clarify what has been implied in other caselaw but has not, to our knowledge, been an explicit holding up to this point. For evidence to be admissible under *Lynch*, it must be evidence of "aggressive *and* violent" character. *Lynch*, 104 Ill. 2d at 200. While plying apart the meanings derived from "and" and "or" is less often integral in interpreting caselaw than it is when interpreting statutory language, it follows logically that the difference is integral here. A person who is aware he has a short fuse and therefore has learned to avoid confrontation might be violent without being aggressive. A person who is quick to make threats but avoids physical confrontation can be aggressive without being violent.

¶ 47        Since the introduction of the Illinois Rules of Evidence, our court has acknowledged that the second prong of *Lynch* has been codified in Rule 405(b)(2), which reads: "In criminal homicide or battery cases when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor, proof may be made of specific instances of the alleged victim's prior violent conduct." Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011); see also *People v. Chavez*, 2025 IL App (1st) 221601, ¶ 148, *People v. Degrave*, 2023 IL App (1st) 192479, ¶ 56-60, *People v. Martinez*, 2021 IL App (1st) 182553, ¶ 35, *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 73, *People v. Yeoman*, 2016 IL App (3d)

140324, ¶ 28. We find it notable that the codification of the second prong of *Lynch* disposed of the word aggressive and refers purely to violent conduct.

¶ 48 It is arguable that the ambit of Rule 405(b)(2) covers *both* prongs of *Lynch*, except in those cases where the only question before the jury is whether the degree of force used by the defendant was warranted. Although the rule makes no explicit mention of evidence offered to show the mental state of the accused, it allows evidence of prior violent conduct without limiting the purposes for which it is offered. We believe that our supreme court's codification of the second prong should inform our interpretation of identical language contained in the first prong. To be admitted under the first prong of *Lynch*, the conduct informing the defendant's behavior must have been violent. In this case, the alleged threats against Hollings involved mere threat, devoid of violence. Accordingly, the circuit court did not abuse its discretion when it denied defendant's motion to introduce the Hollings evidence.

¶ 49 C. Sufficiency of the Evidence Regarding Self-Defense

¶ 50 Defendant also argues that the State failed to prove beyond a reasonable doubt that he did not act in self-defense.

¶ 51 "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004). "The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of force applied; and (6) the beliefs of the person threatened were objectively reasonable." *Id.* at 225. It is the purview of the jury

to assess credibility, weigh testimony, draw inferences from the evidence, and resolve conflicts or inconsistencies in the evidence. *Id.* When reviewing the sufficiency of the State's evidence attempting to disprove a defendant's self-defense claim, the standard of review is "whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that defendant did not act in self-defense." *Id.*

¶ 52    It is not difficult, when viewing the evidence in such a light, to see how a rational trier of fact might conclude that defendant's self-defense claim was disproven beyond a reasonable doubt. If the trier of fact simply did not find defendant's testimony credible, there is no other eyewitness account of the shooting and the trier of fact is left with a man who has admitted to shooting the victim and who has no justification for doing so. A trier of fact could decide not to credit defendant's story because no evidence was presented to corroborate defendant's claim that Thomas knocked some of his teeth out, because defendant's testimony that he "grabbed [Thomas] by the hair and took the gun from her" suggests she was no danger to him once he had the gun, given their size difference, or because Thomas' past history of violence in moments of anger did not align with the videos she recorded, in which she exhibited calm behavior, an interest in maintaining distance, and even concern for defendant's wellbeing when she heard a crash. As such, there was room enough for a reasonable trier of fact to make credibility determinations and draw inferences that would lead one to conclude beyond a reasonable doubt that defendant did not act in self-defense. Accordingly, the evidence was sufficient to disprove defendant's self-defense claim.

¶ 53                               D. Second Degree Murder

¶ 54        Defendant's final argument is that, should we find that the evidence was sufficient to overcome his self-defense claim, this court should nonetheless reduce his conviction to second degree murder rather than first degree murder. The second degree murder statute dictates:

> "(a) A person commits the offense of second degree murder when he or she commits the offense of first degree murder as defined in paragraph (1) or (2) of subsection (a) of Section 9-1 of this Code and either of the following mitigating factors are present:
>
> > (1) at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed; or
> >
> > (2) at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable."

¶ 55        Defendant does not dispute that the elements of first degree murder have been established. This circumstance resembles an inverted sufficiency of the evidence claim, in which defendant asserts that sufficient evidence was presented to prove a mitigating factor that qualifies him for the reduction to second degree murder. "In this context, we consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found [by a preponderance of the evidence] that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 357-58 (1996).

¶ 56        Defendant asserts that "no rational trier of fact could have concluded that [defendant] did not subjectively fear great bodily harm." It is unclear how defendant comes to this conclusion,

as his support for that argument is a list of self-serving conclusory interpretations of the evidence: for instance, that "the cell phone video demonstrated that [defendant] was trying to avoid further conflict by leaving the apartment." A trier of fact could reasonably conclude that the cell phone video also showed Thomas to be keeping distance from defendant while defendant was intoxicated and angry.

¶ 57     Defendant presents nine sentences of factual statements that, in aggregate, he asserts establish his subjective belief that he was justified in shooting Thomas. He argues that they establish as much so strongly that no reasonable trier of fact could find that he did *not* believe the killing justified when he pulled the trigger. Of those nine, six are supported *only* by defendant's own testimony, which a reasonable trier of fact could decide not to credit. Two rely on specific interpretations of the video evidence, which a reasonable trier of fact could interpret differently. The last is simply a conclusory statement that "[i]t defies logic that [defendant] would shoot Thomas, his girlfriend and mother of his child, absent a need to defend himself." Is defendant's version of events, in which Thomas attempts to shoot him, her boyfriend and father of her child, any less defiant of logic? We are uncertain how, with an understanding of the trier of fact's role in determining credibility, in weighing evidence, and in drawing inferences based on the evidence, defendant can come to the conclusion that this is a legally sound argument. It is not. We decline to modify defendant's conviction.

¶ 58                                III. CONCLUSION

¶ 59     For the foregoing reasons, we affirm defendant's conviction.

¶ 60     Affirmed.

22